# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| | ) | **Docket No.:**     **0417 5:16CR00012D-010** |
| **BRENDA JOYCE BROWN** | ) | |
| | ) | |

**Prepared for:**      The Honorable James C. Dever III
                             Chief U.S. District Judge

**Prepared by:**      Mandy L. DiFelice
                             Senior U.S. Probation Officer
                             Wilmington, NC
                             910-679-2032

| **Assistant U.S. Attorney** | **Defense Counsel** |
|---|---|
| Dena J. King | Damon John Chetson |
| 310 New Bern Avenue, Suite 800 | 19 West Hargett Street, Suite 920 |
| Raleigh, NC 27601-1441 | Raleigh, NC 27601 |
| 919-856-4883 | 919-352-9411 |

**Sentence Date:**          January 8, 2018

**Offense:**               <u>**Count 6**</u>:
                         Violent Crime in Aid of Racketeering and Aiding and Abetting
                         18 U.S.C. § 1959(a)(3) and 18 U.S.C. § 2
                         Not more than 20 years imprisonment/$250,000 fine
                         Class C Felony

**Release Status:**       Arrested and detained by federal authorities since February 1, 2017.

**Detainers:**             No detainers.

**Identifying Data:**

| | | | |
|---|---|---|---|
| **Date of Birth:** | October 18, 1984 | **Age:** | 33 |
| **Hispanic Origin:** | Non-Hispanic origin | **Sex:** | Female |
| **SSN#:** | 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 | **Race:** | Black or |
| **FBI#:** | 602061HC0 | | African American |
| **USM#:** | 63216-056 | **Dependents:** | 2 |
| **State ID#:** | NC1116854A | **Height:** | 5ft 7in |
| **ICE#:** | None | **Weight:** | 175 |
| **Education:** | No HS Diploma or GED | **Hair Color:** | Black |
| | | **Eye Color:** | Brown |
| **Citizenship:** | U.S. Citizen | | |
| **Immigration Status:** | None | | |
| **Country of Birth:** | United States | | |
| **Place of Birth:** | Honolulu, HI | | |
| **Driver's License Number:** | NCID 20667467 | | |



| | |
|---|---|
| **Security Threat Group:** | Gangster Killer Blood member, validated by the Intelligence Center with the Raleigh Police Department, Raleigh, North Carolina |
| **Alias(es):** | Also Known As: Brown, Joyce Brenda; Also Known As: Banga, Lady |
| **Alternate IDs:** | Alias Driver's License Number: GAID 058359400; State ID Number: GA4226569L; State DOC (Dept. of Corrections) Number: NC1277461; Alias DOB: 10/11/1984; Alias DOB: 10/18/1994 |

| Scars/Marks/Tattoos: | **Location:** | **Description:** |
|---|---|---|
| | Right Shoulder | "Precious" |
| | Left Shoulder | Cross and "Roshawn" |
| | Left Hand | "BMG" and three stars |
| | Right Thigh | Lion's paw |
| | Right Arm | Heart |
| | Right Hand | "Mi'Angel" |
| | Right Wrist | Five-point crown and "Taliban" |
| | Right Forearm | "Shymir" |
| | Back | Rose, 15 stars, "Beauty," "Rest in Peace Kwan Stewart, Jr.," and Hearts |
| | Neck | "Fruikwan" |
| | Left Knee | Surgical scar |
| | Stomach | Scar |
| | Lower Lip | Pierced |
| | Right Eyebrow | Pierced |

| **Mailing Address:** | Albemarle Regional Jail<br>160 Peregory Lane<br>Charlottesville, VA 22902 | **Residence Address**: | 3823 Brentwood Road<br>Raleigh, NC 27604 |

| **Date First Draft Prepared:** | **October 12, 2017** | **Date Report Revised:** | **November 15, 2017** |
|---|---|---|---|

***Restrictions on Use and Redisclosure of Presentence Investigation Report*** Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence *(i.e.,* classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorists activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

## PART A. THE OFFENSE

### Charge(s) and Conviction(s)

1.    Ten defendants were named in an 11-count Superseding Indictment filed in the Eastern District of North Carolina on January 20, 2017. The Superseding Indictment charged the following conduct:

Count 1: Conspiracy to Participate in a Pattern of Racketeering from 2008 to January 20, 2017, in violation of 18 U.S.C. § 1962(d).

Count 2: Murder in Aid of Racketeering and Aiding and Abetting on May 25, 2009, in violation of 18 U.S.C. §§ 1959(a)(1) and 2.

Count 3: Murder With Firearm During and In Relation to Crime of Violence and Aiding and Abetting on May 25, 2009, in violation of 18 U.S.C. §§ 924(j) and 2.

Count 4: Murder With Firearm During and In Relation to Crime of Violence and Aiding and Abetting on May 25, 2009, in violation of 18 U.S.C. §§ 924(j) and 2.

Count 5: Murder With Firearm During and In Relation to Crime of Violence and Aiding and Abetting on November 21, 2008, in violation of 18 U.S.C. §§ 924(j) and 2.

Count 6: Violent Crime in Aid of Racketeering and Aiding and Abetting on November 13, 2014, in violation of 18 U.S.C. §§ 1959(a)(3) and 2

Count 7: Conspiracy to Distribute and Possess With the Intent to Distribute Controlled Substances from 2008 to January 20, 2017 in violation of 21 U.S.C. § 846.

Count 8: Conspiracy to Commit Witness Tampering from July 2015 to January 20, 2016, in violation of 18 U.S.C. § 1512(k).

Count 9: Witness Tampering and Aiding and Abetting from July 2015 to January 20, 2016, in violation of 18 U.S.C. §§ 1512(b) and 2.

Count 10: Obstruction of an Official Proceeding and Aiding and Abetting from July 2015 to January 20, 2016, in violation of 18 U.S.C. §§ 1512(c) and 2.

Count 11: Obstruction of Justice and Aiding and Abetting from July 2015 to January 20, 2016, in violation of 18 U.S.C. §§ 1503(a), and 2.

2.    A Forfeiture Notice was filed.

3.    Five defendants were named in a 12-count Second Superseding Indictment filed in the Eastern District of North Carolina on September 21, 2017. The Second Superseding Indictment charged the following conduct:

Count 1: Conspiracy to Participate in a Pattern of Racketeering from 2008 to January 20, 2017, in violation of 18 U.S.C. § 1962(d).

<u>Count 2</u>: Murder in Aid of Racketeering and Aiding and Abetting on May 25, 2009, in violation of 18 U.S.C. §§ 1959(a)(1) and 2.

<u>Count 3</u>: Murder With Firearm During and In Relation to Crime of Violence and Aiding and Abetting on May 25, 2009, in violation of 18 U.S.C. §§ 924(j) and 2.

<u>Count 4</u>: Murder With Firearm During and In Relation to Crime of Violence and Aiding and Abetting on May 25, 2009, in violation of 18 U.S.C. §§ 924(j) and 2.

<u>Count 5</u>: Murder in Aid of Racketeering and Aiding and Abetting on November 21, 2008, in violation of 18 U.S.C. §§ 1959(a)(1) and 2.

<u>Count 6</u>: Murder With Firearm During and In Relation to Crime of Violence and Aiding and Abetting on November 21, 2008, in violation of 18 U.S.C. §§ 924(j) and 2.

<u>Count 7</u>: Violent Crime in Aid of Racketeering and Aiding and Abetting on November 13, 2014, in violation of 18 U.S.C. §§ 1959(a)(3) and 2

<u>Count 8</u>: Conspiracy to Distribute and Possess With the Intent to Distribute Controlled Substances from 2008 to January 20, 2017 in violation of 21 U.S.C. § 846.

<u>Count 9</u>: Conspiracy to Commit Witness Tampering from July 2015 to January 20, 2016, in violation of 18 U.S.C. § 1512(k).

<u>Count 10</u>: Witness Tampering and Aiding and Abetting from July 2015 to January 20, 2016, in violation of 18 U.S.C. §§ 1512(b) and 2.

<u>Count 11</u>: Obstruction of an Official Proceeding and Aiding and Abetting from July 2015 to January 20, 2016, in violation of 18 U.S.C. §§ 1512(c) and 2.

<u>Count 12</u>: Obstruction of Justice and Aiding and Abetting from July 2015 to January 20, 2016, in violation of 18 U.S.C. §§ 1503(a), and 2.

4. A Forfeiture Notice was filed.

5. A Notice of Intent to Seek Enhanced Penalty, as to Demetrice Devine, pursuant to 21 U.S.C. § 851, was filed.

| **Defendant** | **Count(s) Charged** | **Disposition** |
|---|---|---|
| Demetrice Regus Devine a/k/a "Respect" 5:16-CR-12-D-1 | Superseding Indictment: Counts 1, 7, 8, 9,10 and 11 2nd Superseding Indictment: Counts 1, 5, 6, 8, 9, 10, 11, and 12 | Arraignment pending. |

| Defendant | Count(s) Charged | Disposition |
|---|---|---|
| Dontaous Demond Devine a/k/a "Scooch" a/k/a "Boochie" 5:16-CR-12-D-4 | Superseding Indictment: Counts 1,2, 3, 6, and 7 2nd Superseding Indictment: Counts 1, 2, 3, 7, and 8 | Arraignment pending. |
| Demetrius Deshaun Toney a/k/a "Meat" 5:16-CR-12-D-5 | Superseding Indictment: Count 4 2nd Superseding Indictment: Counts 1, 4, and 8 | Arraignment pending. |
| Brandon Jowan Mangum a/k/a "B-Easy" 5:16-CR-12-D-6 | Superseding Indictment: Counts 2 and 3 2nd Superseding Indictment: Counts 1, 2, 3, and 8 | Arraignment pending. |
| Jamario Keon Jones a/k/a "Spect Junior" a/k/a "Skeeno" 5:16-CR-12-D-7 | Superseding Indictment: Count 5 | Arraignment is pending. |
| Cleveland McNair a/k/a "Blee" 5:16-CR-12-D-8 | Superseding Indictment: Counts 1 and 7 | 08/15/2017: Pled guilty to Counts 1 and 7. Sentencing is pending. |
| Christopher Darnell Evans a/k/a "Racks" a/k/a "Snacks" 5:16-CR-12-D-9 | Superseding Indictment: Counts 1 and 7 | 09/11/2017: Pled guilty to Counts 1 and 7. Sentencing is pending. |
| **BRENDA JOYCE BROWN a/k/a "Lady Banga" 5:16-CR-12-D-10** | **Superseding Indictment: Count 6** | **07/18/2017: Pled guilty to Count 6.** |
| Katherine Victoria Gast a/k/a "Kat Stacks" 5:16-CR-12-D-11 | Superseding Indictment: Count 6 | 08/21/2017: Pled guilty to Count 6. Sentencing is pending. |
| Shaiona Marie Smith a/k/a "Slyfox" 5:16-CR-12-D-12 | Superseding Indictment: Count 6 2nd Superseding Indictment: Count 7 | 10/04/2017: Pled guilty to Count 7. Sentencing is pending. |

6. On July 18, 2017, with a written Plea Agreement pursuant to Rule 11(c)(1)(A) and (B), **BRENDA JOYCE BROWN** pled guilty to Count 6 of the Superseding Indictment which charged conduct that concluded on November 13, 2014. The parties agreed that a 2-level adjustment for an assault involving more than minimal planning, a 4-level adjustment for use of a dangerous weapon, and a 7-level upward adjustment for permanent bodily injury are warranted. The parties also agreed that the maximum downward adjustment for acceptance of responsibility is applicable.

**Related Cases**

7.      Timothy A. Devine (5:16-CR-12-D2) plead guilty on November 7, 2016, to Misprision of a Felony.  On February 6, 2017, he was sentenced to 24 months custody and 1 year supervised release.

8.      Carletta P. Alston (5:16-CR-12-D3) plead guilty on July 11, 2016, to Conspiracy to Commit Witness Tampering.  On December 14, 2016, she was sentenced to 32 months custody and 3 years supervised release.

**Pretrial Adjustment**

9.      None.

**The Offense Conduct**

Note: Unless otherwise indicated, the defendant did not discuss the offense conduct during the presentence process.

History

10.      In the early 2000s, a United Bloods Nation (UBN) gang set emerged in Raleigh, North Carolina, known as the Black Mob Gangstas (BMG).  Throughout the existence of BMG, BMG members were affiliated with other sets of Bloods, such as Gangsta Killer Bloods (GKB) and One Eight Trey Bloods.  The GKB was led, at the time, by Demetrice Regus Devine.  In approximately 2013, as a result of growing concerns about the establishment of BMG, and whether the set received the proper supervisory blessings to be recognized as an official Blood set, numerous members changed Blood sets and created the Donald Gee Family (DGF).  The DGF was founded and led by Demetrice Devine.  As Demetrice Devine changed sub-sets of the Blood gang, gang members under him would change as well.

Overview

11.      The Federal Bureau of Investigation (FBI) and the Raleigh Police Department (RPD) in Raleigh began an investigation into the criminal activities of the BMG and the DGF sets, collectively known as BMG/DGF.  The investigation established that Demetrice Devine, the leader of the BMG/DGF, was ranked as the "Godfather," the highest rank in North Carolina, and that the gang was involved in homicides, robberies, assaults, drug trafficking, extortion, witness tampering, and obstruction.  Gang members committed crimes on behalf of the gang, and either at the direction of, or with the blessing of, Demetrice Devine.  The rank and role of the gang members in this conspiracy are depicted in the following chart.  Definition of the ranks were recovered from Demetrice Devine's jail cell.

| Demetrice Devine | Ranked as Godfather, and is the leader of the gang. |
| --- | --- |
| Dontaous Demond Devine | Ranked as a High, or 2nd in command, and is Demetrice Devine's cousin. The "2nd in command is responsible for overseeing and giving all orders, and commanding the troops."  Dontaous Devine led BMG/DGF in Raleigh, while Demetrice Devine was incarcerated.  Dontaous Devine sold drugs on behalf of the gang and ordered lower ranking members to engage in criminal activity. |
| Demetrius Deshaun Toney | Ranked as a 5-Star General. |

| Brandon Jowan Mangum | Ranked as a Low. |
| Jamario Keon Jones | BMG/DGF member, but disassociated himself from the gang. |
| Cleveland McNair | Ranked as an Original Gangster or Low Stain, in charge of the "Black Mob Dons" line, and also sold drugs on behalf of the gang. |
| Christopher Darnell Evans | Ranked as a High, in charge of those who collected money, and sold drugs on behalf of the gang. A High Mark is also known as "security defense" and is responsible for making sure the "Family" is safe and protected. "They are ready for war or any harm that comes." |
| **BRENDA JOYCE BROWN** | BMG/DGF member and enforcer. **BROWN** worked as a prostitute. |
| Katherine Victoria Gast | BMG/DGF member. Gast worked as a prostitute. |
| Shaiona Marie Smith | BMG/DGF member. Smith worked as a prostitute. |

12. BMG/DGF primarily operated in the 500 block of Haywood Street in Raleigh, but consistently loitered, sold drugs, terrorized, and controlled the area surrounding Haywood Street as well. All gang members were required to "put in work," or carry out the orders and activities as directed by gang leadership. BMG/DGF held gang meetings, also referred to as deuces, cookouts, or family reunions. A deuce was called by the highest ranking member of the local hood or his designee, and then held at public parks and homes of various gang members in both Raleigh and Greensboro, North Carolina, as well as New York. During the meetings, members recited oaths, collected gang dues, communicated gang information or rule changes, and issued punishments.

13. Gang dues were collected from each member for the benefit of the gang. A portion of the dues were saved and utilized locally in what was referred to as the Community Rent Box (CRB), while the remaining portion was sent up the chain of command to gang leadership. BMG/DGF members were permitted to earn money for CRB dues through various criminal acts including robbery, prostitution, fraud, and drug distribution. The money could be used locally for loans to gang members, to buy drugs, or as gifts, such as prepaid debit cards, to high-ranking members who are incarcerated. Further, individuals selling narcotics in and around Haywood Street, who were not BMG/DGF, were also required to pay gang dues. Individuals who did not pay the required dues risked becoming victims of robberies, assaults, and even murder.

<u>Drug Trafficking</u>

14. From 2008 until January 20, 2017, Demetrice Devine, Dontaous Devine, Cleveland McNair, Christopher Evans, Demetrius Toney, and Brandon Mangum conspired to distribute crack, cocaine, and marijuana. A confidential informant (CI) was utilized to attend gang meetings while equipped with audio and video recording devices. Additionally, Demetrice Devine frequently conversed with other gang members while Demetrice Devine was incarcerated in the North Carolina Department of Corrections, which recorded his phone calls. Many of these informant recordings, as well as recordings of jail telephone calls, include Demetrice Devine instructing the drug trafficking activities of other gang members. On April 8, 2009, Demetrice Devine discussed with higher-ranking gang members the amount of money that could be made selling drugs. He also reminded his gang about his rule that they only buy drugs from other BMG/DGF members to keep the money within the gang family. On April 24, 2009, Demetrice Devine discussed the importance of making money by selling drugs, committing robberies on behalf of the gang, and distributing a portion of the criminal proceeds to the weekly CRB.

On May 15, 2009, Demetrice Devine led a gang meeting wherein he discussed the importance of gang loyalty and maintaining their chain of command. He also stressed the importance of keeping track of guns, explaining that guns served as protection during drug sales and against rival gang members. He further noted that the CRB could be used to buy guns for the gang.

Controlled Purchases and Drug Amounts

15.     From 2008 to 2015, CIs were utilized to conduct a series of controlled purchases from Cleveland McNair and Christopher Evans. Additional CIs provided information regarding the drug quantities distributed by McNair, Evans, Demetrice Devine, Dontaous Devine, Toney, and Mangum. The following chart depicts these purchases, conversations, and drug amounts:

| Date | Conspirator | Quantity of Drugs |
|---|---|---|
| February 5, 2008 | Dontaous Devine | 5 grams of crack |
| RPD arrested Dontaous Devine, after a brief foot pursuit, and recovered 5 grams of crack from his person. | | |
| March 28, 2008 | McNair | 2 grams of marijuana<br>12.2 grams of crack |
| On March 28, 2008, law enforcement executed a search warrant at a residence in Raleigh, and recovered a total of 12.2 grams of crack, 2 grams of marijuana, and digital scales. Subsequent to his arrest, McNair provided an unprotected statement to law enforcement wherein he accepted responsibility for the recovered drugs. McNair stated that he started selling drugs after losing his job. | | |
| June 16, 2009 | McNair | 1 gram of marijuana<br>5 grams of crack |
| A traffic stop was conducted on a vehicle operated by McNair, during which officers smelled marijuana. A search of McNair's person and car resulted in the recovery of 1 gram of marijuana and 5 grams of crack. McNair immediately accepted responsibility for all of the drugs so that his passenger, Katrina Autry (unindicted), would not be held responsible. | | |
| August 26, 2009 | McNair | 0.1 gram of crack |
| November 24, 2009 | McNair | 1 dosage unit of crack[1] |
| May 24, 2011 | Evans | 5 grams of marijuana |
| November 18, 2011 | Dontaous Devine | None. |
| A search warrant was executed by RPD at a home where Dontaous Devine was suspected to be living. Officers recovered approximately 330 grams of marijuana and drug packaging material from the property. Items, such as bills, tied Dontaous Devine, to the home; however, investigation did not appear to establish a connection between Dontaous Devine and the recovered contraband. | | |
| March 1, 2012 | McNair | Pending |
| The offense occurred on March 1, 2012. The drug weight is unknown and receipt of records is pending. | | |
| May 28, 2014 | Evans | 22 grams of cocaine<br>Firearm |
| On May 28, 2014, based on information from a CI, officers conducted a traffic stop of the vehicle driven by Evans, and containing Rashawn Johnson (unindicted), Latarshia Mayo (unindicted), and Ms. Mayo's 11-year-old child. A search of the vehicle resulted in the recovery of 22 grams of | | |

---

[1] Amount of "dosage unit" is unknown.

cocaine, digital scales, and a 9mm handgun. Each occupant agreed to speak with law enforcement; however, Ms. Mayo declined to discuss the contraband recovered from the car. Evans acknowledged that the gun was registered to him, and denied that there was cocaine recovered from his car, before invoking his right to counsel.

| April 14, 2015 | McNair | 27.39 grams of crack |
|---|---|---|
| April 23, 2015 | McNair | 27.8 grams of crack |
| April 24, 2015 | McNair | 53.37 grams of cocaine |
| May 3, 2015 | Dontaous Devine | 47 grams of marijuana |

The Wake Forest Police Department (WFPD) in Wake Forest, North Carolina, stopped a vehicle driven by Dontaous Devine. Officers observed small pieces of marijuana in the car, but found nothing measurable on his person or in the vehicle. Officers returned to an area of the road where they observed Dontaous Devine conduct a u-turn. There they located a total of 47 grams of marijuana.

| May 27, 2015 | Dontaous Devine | 16 grams of marijuana<br>Firearm |
|---|---|---|

Dontaous Devine was arrested by the WFPD for outstanding warrants after he was discovered traveling in a car that contained 16 grams marijuana, drug paraphernalia, and a Glock-22 handgun.

| June 3, 2015 | Evans | 4.74 grams of cocaine |
|---|---|---|

The CI met with Evans in a hotel room Evans utilized for the purpose of selling drugs.

| June 9, 2015 | Evans | 3.67 grams of cocaine |
|---|---|---|

The CI met with Evans in a hotel room Evans utilized for the purpose of selling drugs.

| June 17, 2015 | Evans | 17.82 grams of cocaine |
|---|---|---|

The CI met with Evans in a hotel room Evans utilized for the purpose of selling drugs. During the meeting, Evans discussed his previous drug operations and how he possessed firearms when residing in another area of Raleigh. No drug amounts were provided.

| June 25, 2015 | Evans | 4.59 grams of cocaine |
|---|---|---|

The CI met with Evans in a hotel room Evans utilized for the purpose of selling drugs. Evans had a juvenile (whose relation to Evans is unknown), age 12, in the room with him at the time of the controlled buy.

| 2015 | Demetrice Devine<br>McNair | None |
|---|---|---|

CI2 was part of a three-way conversation between Demetrice Devine and McNair in which they discussed "t-shirts," a coded discussion about drugs. CI2 gave money to McNair on behalf of Demetrice Devine so that McNair could sell crack.

| 2008 to 2009 | Dontaous Devine | 32 grams of marijuana<br>140 grams of cocaine<br>35 grams of crack |
|---|---|---|

CI3 sold marijuana, crack, and cocaine to Dontaous Devine from 2008 to 2009. CI3 sold the following to Dontaous Devine: 7 to 14 grams of marijuana "several times" (4 x 7 grams = 32 grams of marijuana), 7 grams of cocaine at least 20 times (140 grams of cocaine); and 3.5 grams of crack at least 10 times (35 grams of crack).

| 2015 | Carletta Alston<br>Evans | 1,398.3 grams of cocaine |
|---|---|---|

CI4 witnessed Alston purchase 1 ounce of cocaine from Evans, every five days for eight months for a total of 1,360.8 grams of cocaine. CI4 purchased at least 30 grams of cocaine from Evans from January 2015 to June 2015, and also directed customers to Evans. CI4 witnessed these customers

| | | |
|---|---|---|
| purchase 1 to 3.5 grams of cocaine from Evans per week for one month for a conservative estimate of 7.5 grams of cocaine. | | |
| October 2014 to March 2015 | Dontaous Devine | 1,880.46 grams of marijuana 14 grams of MDMA |
| Dontaous Devine fronted 1 ounce of marijuana every three days to CI4 for CI4 to sell for a total of 1,426.86 grams of marijuana (151 days/3 = 50.33 x 28.35 = 1,426.86). Dontaous Devine also fronted CI4 1 pound or 453.6 grams of marijuana during this timeframe. Lastly, CI4 sold two "packs" of Molly for $400 each for Dontaous Devine for a total of 14 grams of MDMA. CI4 stated that it was common practice for Dontaous Devine to supply drugs to lower ranking gang members for distribution so that he could ensure the money would go back to him. Additionally, investigation revealed that if a drug debt was not paid, Dontaous Devine would threaten the person with "DP" or discipline by punishment or assault. | | |

## Murder of Adarius Fowler

16. On November 21, 2008, Adarius Fowler, 16, was murdered outside of a convenience store in Raleigh. Fowler was shot in the palm, chest, abdomen, and thigh. At the time of his death, Fowler was a GKB gang member, a rival Blood set to BMG/DGF. Investigation revealed that earlier in the day, Demetrice Devine picked up Jamario Jones (16 at the time) from Jones' home. Demetrice Devine, who was carrying a .357 handgun for himself, provided a .380 handgun to Jones. Demetrice Devine then told Jones and James Alston, a/k/a Hitman (16 at the time and now deceased), to go to the nearby store to find any rival GKB or G-Shine members. Jones and Alston walked to the convenience store and shot and killed Fowler in a nearby alley as he exited the store.

17. Later, on November 21, 2008, Alston was interviewed by law enforcement. According to reports, he was evasive and untruthful during the interview; however, he admitted to discharging a firearm at the victim several weeks prior to the murder. At the time of the interview, investigation had not established probable cause to arrest Alston, who, himself, was later murdered in an unrelated incident.

18. On November 26, 2008, following the instructions of Demetrice Devine, Jones shot a person identified as P.B. P.B. had spoken to agents about the Fowler murder, and was shot and injured in retaliation for speaking to law enforcement.

## Murder of Rodriguez Burrell

19. On May 25, 2009, Rodriguez D'Shay Burrell, 18, was murdered sitting on the front porch of his father's home on Haywood Street. Burrell and his father were sitting on the front porch when a man dressed in all black approached Burrell and shot him in the head and twice in the leg. Immediately after the shooting, the suspect ran from the home through a field in an adjacent lot. A K9 officer was utilized and tracked through the empty field and located one Nike Air Force One shoe. Additionally, three 9mm shell casings and a small amount of marijuana were collected from the crime scene.

20. Notably, Burrell was a 9 Trey gang member, a rival Blood set to BMG/DGF. Burrell frequented Haywood Street as a result of his family living there; however, he also sold marijuana on Haywood Street in the heart of BMG/DGF's territory. Investigation revealed that several days prior to the shooting, members of BMG/DGF confronted Burrell requesting that he pay the CRB. Just prior to the shooting, witnesses observed Dontaous Devine, Demetrius Toney (17 at the time), and Brandon

Mangum near Haywood Street dressed in all black. Dontaous Devine instructed Toney and Mangum on their roles, and Toney showed the others a gun in his waistband and said he "was about to put it in." Immediately thereafter, Burrell was murdered, after which witnesses observed Toney and Mangum arrive at Dontaous Devine's apartment. Toney was missing a shoe.

21.     On September 24, 2009, Toney was questioned by law enforcement concerning his whereabouts on the night of Burrell's murder, and his knowledge regarding gang members. Toney provided several contradictory statements and denied knowing Dontaous Devine; however, agents knew that Toney had been stopped at a license checkpoint in June 2009, and was in the car with Dontaous Devine and Christopher Evans. Toney also denied knowing Demetrice Devine, even though Toney had "BMG" tattooed on his neck. Toney admitted that the shoe recovered from the crime scene was his; however, claimed that someone stole some of his shoes including the shoes in question.

22.     On September 25, 2009, Mangum and Toney were arrested and charged with murder. Subsequent to his arrest, Mangum confessed his involvement in the murder of Burrell to another person (identity protected). Mangum stated that Dontaous Devine told him to "carry out the hit." Mangum acknowledged that they had left a shoe at the crime scene and felt that was the only thing that could tie them to the murder. Toney declined to provide a statement to law enforcement. Mangum was interviewed by law enforcement, but denied any involvement in the murder.

23.     Dontaous Devine was arrested on September 26, 2009, and charged with murder[2]. While he was incarcerated, Dontaous Devine confessed to another person (identity protected) that he was involved in the murder of Burrell, but that Toney and Mangum did the shooting. Dontaous Devine also stated, "dumb ass left his shoe."

24.     On June 23, 2015, a CI provided a statement wherein the CI recalled a gang meeting (date unknown) during which the CI heard Mangum express anger towards Dontaous Devine because Mangum had to stay in jail for so long when it was actually Dontaous Devine who pulled the trigger. Dontaous Devine replied by saying, "It's not my fault they dropped the charges against me and let me go instead of you."

<u>Assault With A Deadly Weapon</u>

25.     On November 13, 2014, the victim received a phone call from BMG/DGF members asking the victim to go to the Wake Inn, Room 103, in Raleigh. Unbeknownst to the victim, BMG/DGF members were upset with him/her and were seeking revenge. Once the victim arrived at the hotel room, one of the gang members answered the door, and when it closed behind him/her, Shaoina Marie Smith ran out of the bathroom and punched the victim to the ground. Then, **BRENDA JOYCE BROWN** and Katherine Victoria Gast ran from the bathroom and began hitting the victim. The victim was held to the ground while Smith, **BROWN**, and Gast punched him/her repeatedly. **BROWN** then cut the victim with a razor several times causing cuts to his/her face, right wrist, and buttocks. During the attack, the victim could hear Dontaous Devine's voice in the room telling him/her to fight back. Investigation revealed it was Dontaous Devine who ordered Smith, **BROWN**, and Gast to assault the victim.

26.     Later, on November 13, 2014, the victim was interviewed by law enforcement. The victim advised that he/she was reluctant to discuss the details of the attack as he/she feared for his/her safety. The victim

---

[2] The charges were later dismissed by the Wake County District Attorney's Office in Raleigh.

indicated that the attack was gang related, and that the gang was upset with him/her for associating with the wrong person. The victim went on to explain that the person he/she was with had the same name as an individual the gang labeled as "food," which meant that person could be harmed at any time. The victim believed the attack was a result of a mistaken identity.

27.    Due to the uncooperativeness of the victim, the case was cold until **BROWN** was interviewed on March 11, 2015. **BROWN** was incarcerated on unrelated charges when she provided an unprotected statement regarding the assault. **BROWN** explained that the gang was mad at the victim because they believed he/she had lied about being with someone whom the gang did not approve of. A gang member, identified only as "Pocket," called the victim and told the victim that they had a "$100 call," or prostitution call. When the victim entered the room, he/she was assaulted. After being confronted with video evidence, **BROWN** acknowledged that she, Smith, and Gast were present, but denied knowledge of who actually cut the victim.


<u>Witness Intimidation and Tampering and Obstruction</u>


28.    In October 2015, several gang members were served with federal grand jury subpoenas in relation to an ongoing investigation. Throughout that time period, Demetrice Devine was serving a term of imprisonment based on 2011 state convictions. As such, all of his phone calls were recorded. Demetrice Devine's brother, Timothy Devine, was in federal custody at a residential re-entry center (RRC) in Raleigh, for a 2008 firearms conviction, until his release on supervised release on September 21, 2015. A review of Demetrice Devine's phone calls revealed that many of his calls were placed to Carletta P. Alston, who would then connect to a third telephone line at Demetrice Devine's direction. Alston was a known high-ranking BMG/DGF member. Many of the three-way communications established by Alston facilitated communications between Demetrice Devine and other known BMG/DGF and Blood gang members, including Timothy A. Devine and Cleveland McNair.

29.    On October 8, 2015, after learning that individuals had been served with grand jury subpoenas, Alston informed Demetrice Devine about the subpoenas. As additional individuals were served subpoenas, Alston continued to inform Demetrice Devine of that information. Between October 8, 2015, and November 4, 2015, Alston and Demetrice Devine spoke in coded language about the subpoenas issued to grand jury witnesses. At Demetrice Devine's direction, Alston conducted three-way calls to other gang members so that Demetrice Devine could speak with those individuals about gang activity and the issuance of the grand jury subpoenas. They discussed their belief that authorities were working on a RICO case against them and attempted to determine who may be providing information to law enforcement. At Demetrice Devine's instruction, Alston also attempted to contact several of the grand jury witnesses. They were successful in speaking to at least two of the grand jury witnesses prior to the scheduled court date. Through calls facilitated by Alston, Demetrice Devine was provided information about the investigation and was also informed that someone at a recent gang meeting had been recording conversations with audio equipment. Following a scheduled grand jury session on October 20, 2015, Alston called Demetrice Devine to provide him with the information she learned about what had transpired at court that day.

30.    On October 29, 2015, Alston initiated a three-way call with Demetrice Devine and Timothy Devine, at Demetrice Devine's direction. During that call, Timothy Devine advised that he spoke with one of the witnesses, who was scheduled for grand jury testimony in December. Demetrice Devine informed

Timothy Devine, "Make sure you tell him that motherfuckers seen his son the other day, you feel me, that motherfucker rolled by and seen his son outside playing so everything alright, you know what I mean." Demetrice Devine further stated, "Men need to be men." He instructed Timothy Devine to "check motherfucker like at a club at the door type shit" (check for a wire) before talking to that witness. Authorities subsequently met with the witness referenced in this call and played him the recording of the conversation between Demetrice Devine and Timothy Devine. The witness agreed that the statement about his son was a threat and further noted that he had observed a car occupied by two males watching him the previous evening when he was visiting his son. The witness could not see their faces, but when he got to his vehicle, the car slowly drove by and left the area.

31.     On January 25, 2016, Timothy Devine participated in an unprotected interview with FBI agents. Timothy Devine advised authorities that he is the head of the 6 Deuce Brim Hoods, and that his brother, Demetrice Devine, is the head of the Black Mob Gangsters. Timothy Devine acknowledged that he engaged in conversations with Demetrice Devine while Demetrice Devine was incarcerated. He admitted they had spoken on more than one occasion about a witness being served with a federal grand jury subpoena. Timothy Devine further advised that during a conversation with Demetrice Devine, Demetrice Devine told him and Dontaous Devine to go see that witness and tell him some guys saw the witness' son playing in the front yard. Timothy Devine maintained that he never passed that message on to the witness. As a result of the tampering with grand jury witnesses, the government did not proceed with grand jury proceedings for safety reasons.

32.     Numerous recorded telephone calls made by Demetrice Devine while he was incarcerated in the North Carolina Department of Corrections in 2015 demonstrated that Demetrice Devine still oversaw and controlled the gang. On May 2, 2015, Demetrice Devine spoke to Alston about an upcoming meeting, and told her, specifically, what she should discuss. On May 3, 2015, Alston updated Demetrice Devine on the meeting held the day prior, and Demetrice Devine told Alston to collect dues from those members that were not present at the meeting. Additional calls contain Demetrice Devine talking with higher ranking gang members about gang dues collected and how much should be sent to those higher-ranking members.

33.     Further, jail telephone records detailed the drug conspiracy of various gang members. For example, on August 29, 2015, McNair told Demetrice Devine that McNair was selling marijuana. Demetrice Devine told McNair to call "someone," so that person could "invest in the store." The store refers to the drug operation portion of the gang. On September 13, 2015, Demetrice Devine spoke to Alston and stated that McNair needed to put money in the store. The following day, Alston confirmed that McNair had done as instructed.

<u>Extortion</u>

34.     Demetrice Devine and Dontaous Devine required gang members to pay weekly gang dues to the CRB. Non-gang members were required to pay weekly gang dues in order to sell drugs in and around the area dominated by BMG/DGF. CI5 was never a member of the gang, but was required to pay gang dues in order to sell drugs near Haywood Street. CI5 paid between $35 and $50 a week to Dontaous Devine, and believed if he/she did not pay, he/she would be punished by the gang. Punishment equated to being robbed or shot. In further support of this belief, Dontaous Devine told CI5 that the murder of Rodriguez Burrell occurred because he failed to pay gang dues. CI5 continued to pay gang dues to stay in good standing with BMG/DGF.

Recorded and Documentary Evidence

35.     As noted previously, a CI was utilized to attend gang meetings while equipped with audio and video recording devices.  Information gathered during these meetings provided further support and details of Demetrice Devine's leadership of this violent street gang.  The following chart depicts some of these recordings and other documentation seized:

| | |
|---|---|
| October 4, 2008 | Demetrice Devine told gang members he would give stars, or increase their rank, for anyone that shot or killed a specific high-ranking 9 Trey gang member. |
| December 10, 2008 | Demetrice Devine rapped about his gang involvement, selling drugs, and the police trying to arrest him for his criminal activities.  Demetrice Devine was recorded saying, "GKB the fuck up, BMG is the future, Respect a/k/a Soop Woop" (aliases of Demetrice Devine), while stacking gang signs. |
| December 10, 2008 | An unidentified cooperator recorded Demetrice Devine leading a gang initiation "beat-in."  In the video, Demetrice Devine held a red bandana while standing in front of the two initiates, and everyone repeated gang chants including "31 seconds to be born Blood." |
| April 20, 2009 | An unidentified cooperator recorded a conversation wherein Dontaous Devine bragged about robbing a person of their jewelry and stealing a car.  The jewelry was described as unique in style.  The cooperator later saw Demetrice Devine wearing the jewelry. |
| April 24, 2009 | A gang meeting was recorded in which gang members were disciplined by Demetrice Devine.  Demetrice Devine assaulted one member after he questioned if the gang cared about its members. The audio records the victim pleading with Demetrice Devine as he is being punched in the face.  During the assault, Demetrice Devine can be heard telling the victim to "shut the fuck up" and that the victim should assault himself, and that "everyone got a god damn part to play."  Demetrice Devine then announces to "do your fucking job, if not, yo rank gonna get fucking took brah," and then orders the victim to fight with another gang member. |
| Date Unknown | Evans was recorded bragging to other gang members about beating a man.  Law enforcement were able to independently verify that this beating occurred.  Injuries to the victim are unknown as the victim is not identified. |
| June 6, 2015 | A gang meeting was hosted by McNair wherein another member discussed prior shootings he had participated in, his allegiance to Demetrice Devine, and the importance of collecting money.  Additionally, the gang member ordered the female gang members, referred to as "Donnas," to "eat," or assault, any other female not authorized to be associating with BMG/DGF members. |

Search Warrants and Seizures

36.     The following chart depicts the various search warrants and seizures executed on BMG/DGF:

| Date | Conspirator | Items Seized |
|---|---|---|
| April 29, 2014 | Gast | Gang literature, handgun, ammunition, and a red bandana were seized from Gast's hotel room. |
| March 3, 2015 | Demetrice Devine | Gang literature was seized from Demetrice Devine's jail cell including the names and addresses of the co-defendants. |
| April 14, 2015 | Demetrice Devine | Gang literature including the BMG/DGF hierarchy, "Main Hood Line Up and Position," was seized from Demetrice Devine's jail cell. |
| February 1, 2017 | Shaiona Smith | At the home of Shaiona Smith, officers recovered $365 in U.S. currency, 30 rounds of .223 ammunition, an unmeasured amount of marijuana, a total of 8 cell phones, drug paraphernalia and packaging material, three plastic baggies containing white powder residue, a stolen AR-15 rifle, and a 30-round Glock magazine with 14 rounds of 9mm ammunition. |

### Witness Statements and Debriefs

| Date(s) | Conspirator(s) |
|---|---|
| June 16, 2015<br>June 23, 2015 | Dontaous Devine<br>**BRENDA BROWN** |
| A CI advised that Dontaous Devine prostituted women on Backpage.com. The CI also advised that Dontaous Devine had put out an "eat on sight" order regarding another person for "snitching." "Eat on sight" means that if a member of BMG/DGF sees this person, they are to assault him or her. The CI advised that the CI had fallen out of favor with the gang for numerous reasons, one being that the CI was previously accused of being a "snitch." The CI advised that **BROWN** complained about the CI to the gang believing the CI was a "snitch." ||
| January 26, 2016 | Demetrice Devine |
| Demetrice Devine was interviewed subsequent to his federal arrest. During the interview, he denied conduct related to witness tampering, and stated that BMG was a community organization set up to hand out Christmas presents. Demetrice Devine eventually admitted to his gang membership after being confronted with documentation proving same. He denied assaulting anyone, or knowing that guns were stashed on Haywood Street. ||
| January 25, 2016 | Evans<br>Demetrice Devine |
| A cooperating witness (CW) provided an unprotected statement explaining that the CW was reluctant to cooperate and the CW feared for the CW's safety with regards to BMG/DGF. The CW admitted to concealing cell phones and contraband in sub sandwiches to smuggle the items in prison for other members of BMG/DGF, and on one occasion, the CW and Evans met with a correctional officer to provide the officer with the sub sandwich. The CW went on to explain/confirm the BMG/DGF hierarchy and organization. The CW advised that Demetrice Devine had manipulated a female correctional officer at Scotland Correctional to smuggle in cell phones and other contraband. ||

| Date(s) | Conspirator(s) |
|---------|----------------|
| April 26, 2016 | Demetrice Devine<br>Dontaous Devine<br>Smith |

CW3 provided a protected statement to law enforcement explaining that CW3 was the "First Lady" to Demetrice Devine and that CW3's role was to facilitate communication between gang members, keep gang money straight, and do anything else a higher ranking member may request. CW3 moved away from Raleigh from 2012 to 2013, but returned after Dontaous Devine offered CW3 a way to make money including smuggling contraband into prison. CW3 also collected money for the CRB and sent same to higher ranking gang members in New York. CW3 advised that Shaiona Smith reported directly under CW3. CW3 assisted Dontaous Devine by selling cigarettes in New York and a telephone scam he operated. CW3 explained that Dontaous Devine would pay people $100, who had no credit history, to go to various stores and open a cell phone account with as many lines and new phones as possible. Dontaous Devine would then sell the phones.

| | |
|---------|----------------|
| May 23, 2016 | Demetrice Devine<br>Mangum<br>Toney |

CW4 was admittedly a member of BMG/DGF, and advised that CW4 had to pay $31 every other week to the CRB, despite that CW4 made money for the gang by selling cocaine and marijuana. CW4 explained that CW4 was obligated to join BMG/DGF because of family connections and because CW4 lived and sold drugs on Haywood Street. CW4 stated that CW4 would have faced assault and/or disciplinary punishment had CW4 not joined and paid rent to the CRB. CW4 was present when Demetrice Devine knocked a tooth out of another member's mouth as a result of that member not paying his drug debt. CW4 admits that CW4 provided drugs to Mangum and Toney to sell, but did not provide quantities or timeframes of same.

| | |
|---------|----------------|
| May 23, 2015 | Demetrice Devine<br>Dontaous Devine |

CW5 stated that CW5 was friends with Dontaous Devine before Demetrice Devine saw CW5 as someone who could make the gang money by selling drugs. CW5 noted that Demetrice Devine forced people to do things and ruled by fear. CW5 noted that CW5 stopped attending BMG/DGF meetings and lives in fear of Demetrice Devine or other new members of the gang.

| | |
|---------|----------------|
| September 2, 2015<br>September 16, 2015 | Demetrice Devine<br>Dontaous Devine<br>Mangum<br>Evans<br>Toney<br>Jones<br>**BROWN**<br>Gast<br>Smith |

CW9, a BMG/DGF member, advised that CW9 spoke to Demetrice Devine while Demetrice Devine was incarcerated via contraband cell phones. CW9 advised that CW9 drove a car for Mangum while they stalked the home of someone Mangum "was beefing with." Mangum had a gun at the time. CW9 provided details on the following gang members: Dontaous Devine was a co-godfather, was involved in a phone scam, sold marijuana, CW9 had bought and sold drugs for Dontaous Devine, and

| Date(s) | Conspirator(s) |
|---------|----------------|
| has seen Dontaous Devine with a gun; Evans was ranked as a "high," sells cocaine, has bought from and brokered deals for others with Evans, and had seen Evans with a gun; McNair was ranked as a "high," sold crack, and CW9 has seen McNair with a gun; Mangum was ranked as a "low," sold marijuana, was involved in the phone scam, CW9 had bought drugs from Mangum, and had seen Mangum with a gun; Gast held no rank and was a prostitute; **BROWN** was ranked as a "1-Star," was a prostitute, and a female enforcer; CW9 knew **BROWN** to have stabbed a girl, helped with robberies, and to have paid into the CRB; Toney's rank was not noted, but it was stated that he moved out of Raleigh; Smith held the rank of "2-Star," was a prostitute, committed robberies, often played the role of the get-a-way driver, and participated in assaults; and Jones, CW9 did not know. Timeframes and quantities for the noted activities were not provided. CW9 also confirmed that Dontaous Devine ordered the murder of Rodriguez Burrell, and ordered Mangum and Toney to commit the murder. ||
| March 29, 2016 | Demetrice Devine<br>Mangum |
| CW6 advised law enforcement that the gang was also involved in selling liquid PCP and had seen at least 2 ounces (56.7 grams) of PCP at one time. CW6 also advised of a robbery committed in 2013 by Mangum and others. They entered a marijuana supplier's home and assaulted a mother in front of her child before stealing a PlayStation. ||
| August 10, 2016 | Demetrice Devine |
| CW7 advised that he had fallen out of favor with BMG/DGF and, as a result, Demetrice Devine had labeled CW7 as "food." CW7 was jumped by BMG/DGF members who held CW7 down and attempted to brand CW7 with the "4th paw." The "4th paw" is burned into the area of the skin with an existing dog paw tattoo to symbolize that the individual had been removed from a gang. Members of a rival gang saw the assault and arrived with shotguns in their hands to help CW7. CW7's home was shot at a short time after the assault. ||
| October 4, 2016 | Demetrice Devine |
| CW8 was an inmate with Demetrice Devine and held rank within the BMG/DGF. CW8 advised that while incarcerated with Demetrice Devine in August 2015, Demetrice Devine ordered the stabbing of another inmate who had told staff that he, Demetrice Devine, was in possession of a contraband phone. CW8 went on to explain that Demetrice Devine was still running BMG/DGF from prison, and he was directing multiple people to do his and the gang's bidding in his absence. ||

38.  Investigation established that **BRENDA BROWN** was a member of the BMG/DGF gang and operated at the direction of its leaders. **BROWN** was a prostitute who earned money for the gang's community rent box and conspired to participate in racketeering activity. Specifically, **BROWN** is responsible for a violent crime in aid of racketeering on November 13, 2014. Enhancements for the assault involving more than minimal planning, use of a dangerous weapon, and causing permanent bodily injury are warranted. On July 18, 2017, **BROWN** submitted a written statement acknowledging her guilt in the offense to which she has pled guilty. **BROWN** stated that she did so in an effort to maintain her rank in the BMG/DGF, and that she regrets her actions.

### Defendant Statements/Admissions

39.  **BROWN** provided an unprotected statement to law enforcement on March 11, 2015.

**Victim Impact**

40.    The provisions of the Mandatory Victim Restitution Act of 1996 apply to this Title 18 offense.

41.    Assault With a Deadly Weapon: Immediately following the assault, the victim received medical care at WakeMed Hospital in Raleigh.  He/she sustained three cuts and presently has scars from the attack on his/her face, right wrist, and right buttocks.  The first cut was on the right side of his/her face from the eye or eyebrow area to her temple, the second was a 1.5 inch laceration on his/her right wrist, and the third was approximately a 6 inch laceration to his/her right hip-buttocks area.  The victim's injuries required stitches and glue, and were confirmed by medical records.  A request was sent to the victim inquiring about financial loss and/or mental harm, but a response has not been received.

42.    Murder of Adarius Fowler: The victim suffered a gunshot wound to his left palm which exited through the back of his hand; a second round struck him in his right chest area and penetrated his right lung and aorta before lodging in his kidney; a third round struck him in his right abdomen area and penetrated his iliac artery before stopping in the pelvis area; and the fourth round struck the outside of his right thigh exiting to the rear of the thigh.  Family members of the victim have been sent letters requesting information regarding their emotional struggles and any financial loss they may have incurred.  A response has not been received.

43.    Murder of Rodriguez Burrell: The victim suffered gunshot wounds to his head, left thigh, and left calf.  Family members of the victim have been sent letters requesting information regarding their emotional struggles and any financial loss they may have incurred.  A response has not been received.

**Offense Behavior Not Part of Relevant Conduct**

44.    None.

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

**Juvenile Adjudication(s)**

45.    None.

**Adult Criminal Conviction(s)**

Note: Unless otherwise indicated, the defendant was represented by counsel or waived counsel, and the supervision/institutional adjustment is unavailable.

| | Date of Arrest | Conviction/ Court | Date Sentence Imposed/Disposition | Guideline/ Points | |
|---|---|---|---|---|---|
| 46. | 07/18/2011 (Age 26) | Assault With a Deadly Weapon (M) 11CR216578 Wake County District Court, Raleigh, NC | 08/08/2011: Pled guilty, 75 days custody, suspended, 18 months probation 11/16/2011: Probation revoked, 30 days custody | 4A1.1(c) | 1 |

The offense occurred on July 18, 2011. Brown was ordered not to harass, assault, or threaten Demetrious Hinton, the father of her youngest child.

Supervision Adjustment: The defendant absconded supervision, tested positive for an illegal substance, failed to attend substance abuse treatment, and failed to report as instructed.

| | | | | | |
|---|---|---|---|---|---|
| 47. | 11/27/2012 (Age 28) | Driving While License Suspended or Revoked (M) 12CR390655 Fulton County State Court, Atlanta, GA | 12/12/2012: Found guilty, 16 days custody, time served | 4A1.2(c)(1) | 0 |

The offense occurred on November 27, 2012.

| | | | | | |
|---|---|---|---|---|---|
| 48. | 02/01/2013 (Age 28) | Driving While License Revoked (M) 13CR706732 Wake County District Court, Raleigh, NC | 06/10/2013: Pled guilty, consolidated with 13CR212919, 30 days custody | 4A1.2(a)(2) | 0 |

The offense occurred on February 1, 2013.

| | | | | | |
|---|---|---|---|---|---|
| 49. | 05/18/2013 (Age 28) | Larceny (M) 13CR211658 Wake County District Court, Raleigh, NC | 06/10/2013: Pled guilty, consolidated with 13CR212919, 30 days custody | 4A1.2(a)(2) | 0 |

The offense occurred on May 18, 2013. The defendant was initially charged with felony Larceny From a Merchant by Removing, Destroying, or Deactivating a Tag.

| | | | | | |
|---|---|---|---|---|---|
| 50. | 06/01/2013 (Age 28) | Larceny (M) 13CR212919 Wake County District Court, Raleigh, NC | 06/10/2013: Pled guilty, 30 days custody | 4A1.1(c) | 1 |

The offense occurred on April 29, 2013. A felony charge of Obtaining Property by False Pretense was dismissed.

| | | | | | |
|---|---|---|---|---|---|
| 51. | 12/17/2013 (Age 29) | Simple Possession of a Schedule II Controlled Substance (M) 13CR774819 Wake County District Court, Raleigh, NC | 07/17/2015: Pled guilty, 15 days custody | 4A1.1(c) | 1 |

The offense occurred on December 17, 2013. Charges of Possession of Drug Paraphernalia and Violation of Unsupervised Probation were dismissed. Notably, records do not indicate that the defendant was serving a term of unsupervised probation.

52.     Brown was also convicted of the following charges in Wake County: two counts of No Operator's License (06CR19845 and 08CR745561), Simple Worthless Check (07CR93100), and Driving While License Revoked and Failure to Secure a Passenger Under the Age of 16 (12CR739513). No criminal history points are assigned. USSG §4A1.2(c).

### Criminal History Computation

53.     The criminal convictions above result in a subtotal criminal history score of 3.

54.     The total criminal history score is 3. According to the sentencing table in USSG Chapter 5, Part A, a criminal history score of 3 establishes a criminal history category of II.

### Other Criminal Conduct

55.     None.

### Pending Charges

56.     None.

### Other Arrests

57.     On March 9, 2005, the defendant was charged with two counts of Assault With a Deadly Weapon With Serious Injury (05CR19917 and 05CR19918) in Wake County, NC. On March 31, 2005, no probable cause was found.

58.     The following charges were dismissed in North Carolina: False Report to a Police Station (07CR57061) in Harnett County; and Disorderly Conduct at a Terminal (03CR87320), three counts of Failure to Stop for a Stop Sign or Flashing Red Light (06CR19845, 07CR61046, and 07CR72580), three counts of Fictitious, Cancelled, or Revoked Registration Card or Tag (07CR737029, 07CR737426, and 07CR61046), Failure to Sign Registration Card (07CR737029), No Seat Belt (07CR737426), Failure to Comply With License Restrictions (07CR72580), Resisting a Public Officer (08CR13353), Failure to Reduce Speed (08CR745561), two counts of Driving While License Revoked (09CR771809 and 12CR732174), Brake or Stop Light Equipment Violation (09CR771809), Larceny (03CR104959), Assault With a Deadly Weapon (11CR205055), Expired Registration Card or Tag (12CR732174), Prostitution (15CR716232), and Possession of Marijuana (15CR777283) in Wake County.

## PART C. OFFENDER CHARACTERISTICS

### Personal and Family Data

Note: The defendant's family information was largely unverified due to a lack of available contacts; however, the paternal grandmother of one of Brown's children, Teresa Hinton, was able to verify some familial information.

59.     Brenda Joyce Brown was born on October 18, 1984, in Honolulu, Hawaii, to Dwight Brown, 54, and Beonnie Pendleton (nee Lowrey), 54. The defendant's mother, now retired, was in the U.S. Navy. Her father resides in Milton, Vermont, and is employed as a basketball coach and computer engineer.

Brown stated that her parents were married and raised her together until she was approximately 6 years old. At that point, her parents divorced, and her contact with her father became intermittent. The defendant's father was reportedly an abusive man to his wife, and never paid child support after he left.

60.     Brown lived with her mother and step-father, Kenneth Pendleton, until age 14, when Brown began to exhibit anger management issues. The defendant explained that it was because of her behavioral problems, her mother put her in a group home. Brown stayed in various foster placements and group homes in Fayetteville, North Carolina, before becoming pregnant, and then being placed in Timber Ridge Group Home in Raleigh, North Carolina. When the defendant was 18 years old, she was no longer allowed to live in the home. Brown indicated that her mother would visit her intermittently and on birthdays. While residing with her mother, all of the defendant's basic needs were met in a home free of abuse; however, Brown was sexually abused in one of the group homes. She declined to discuss this topic further. Brown has one sister, Brandy Brown, 34, in Cary, North Carolina; and two paternal half-brothers, Krystopher Brown, 21, and Justin Brown, 12, who both reside with their father in Vermont. The defendant did not report a close relationship with any member of her family.

61.     The defendant has lived in the Raleigh area since the age of 14. Prior to then, she moved frequently as a result of her mother's Navy career. Brown has resided in Hawaii; San Diego, California; Guam; Chicago, Illinois; and Fayetteville.

62.     Brown has never been married and has had five children. Precious Ellis, 12, was born from the defendant's relationship with Vick Ellis. Brown reportedly gave her daughter away at birth. Angel Brown, 7, was born from the defendant's relationship with Demond Octetrae. Angel reportedly lives with her grandmother, Martha Speers, in Raleigh. Shymir Hinton, 6, was born from Brown's relationship with Demetrious Hinton, and resides with his father in Raleigh. Teresa Hinton, Shymir's paternal grandmother and primary caregiver, verified this information. The defendant declined to discuss the remaining two children, stating only that she terminated her parental rights to both. Brown is currently not ordered to pay child support; however, the North Carolina Child Support Enforcement has advised that they intend to file an order of support against the defendant for Shymir.

63.     The defendant indicated that she plans to reside with her mom in Marietta, Georgia; her uncle (name not stated) in Raleigh; or Demetrius Hinton in Raleigh, upon her release from prison. The defendant has not previously resided in these homes.

**Physical Condition**

64.     In 2000, during the 11th grade, the defendant suffered an unknown injury to her left knee. The injury required surgery, the specifics of which were not recalled. Beyond occasional pain in the left knee, the defendant is healthy.

**Mental and Emotional Health**

65.     Brown advised that she was diagnosed and prescribed medication for Attention Deficit Disorder (ADD) as a child, but that she outgrew the condition. The defendant also recalled visits with various treatment providers for the treatment of her "anger management issues." Brown was prescribed Lithium and Wellbutrin, but could not recall the specifics of her treatment or any diagnosis beyond ADD. The defendant denied any desire or need for mental health treatment.

**Substance Abuse**

66.     Brown reportedly first drank alcohol when she was 21 years old, and was a social drinker until her instant arrest.  She first smoked marijuana when she was 17 years old, and consumed the substance on a daily basis until her arrest for the instant offense.  Brown noted that she smoked 2 to 3 "blunts" a day, but denied addiction.  She also experimented with cocaine on two occasions between the ages of 25 and 30.  The defendant has never participated in drug treatment, but has requested consideration for participation in any drug treatment programs that may be available to her in the Bureau of Prisons.

**Educational, Vocational and Special Skills**

67.     Brown withdrew from Cary High School in Cary, North Carolina, in 2000 during the 11th grade.  She explained that she played on both the basketball and volleyball teams and was, in fact, set to play volleyball at a college when she injured her knee.  Following her injury, she lost interest in school, but now would like to obtain her GED.  Her transcript depicts a mostly above average student through both 9th and 10th grades, but by the 11th grade, all of her scores were Ds and Fs.  She did not state any desire for education or training while in the Bureau of Prisons. The defendant reported marketable skills in housekeeping and food service.

**Employment Record**

Note: Unless otherwise indicated, employment records, including the reason for separation, were not available.

68.     December 2016 to the present:  Unemployed.

69.     March 2016 to November 2016:  Brown reportedly earned $8.75 per hour with Hampton Inn in Raleigh, as a housekeeper.  She resigned her position due to the instant investigation.

70.     January 2016 to April 2016: The defendant indicated that she was employed at McDonalds in Raleigh as a cashier, earning $7.50 per hour.  She resigned to take the position at the Hampton Inn.

71.     2016: Brown was employed for seven days with Sonic in Raleigh as a cashier, earning $7.25 per hour.  She resigned her employment for unstated reasons.

72.     2009 to 2016:  The defendant was unemployed.

73.     2008: Brown reported employment with Allen Distributors in Raleigh selling vacuum cleaners.  She was paid commission only and resigned due to her pregnancy.

74.     2006 to 2008:  The defendant was unemployed.

75.     2001 to 2006:  Brown reported the following employment in Wake County, North Carolina, but could not recall her income or position: Food Lion Grocery Store, Ruby Tuesday's Restaurant, and K&W Cafeteria.

76.     The defendant stated that she does not have any further employment history, but did note that she attempted to enter the U.S. Navy, but was unfit due to her knee injury.  Internal Revenue Service records

were requested, but not received. Social Security Administration records confirmed income from 2001 to 2008, 2011 to 2012, and 2015 to 2016.

#### Financial Condition: Ability to Pay

77.     Financial information was obtained from a personal financial statement provided by the defendant and a review of public records. Supplemental information was supplied by an independent credit source.

#### Assets

None

#### Liabilities

| | | |
|---|---|---|
| Collection Account | Medical (two accounts) | $2,320.00 |
| Collection Account | Duke Energy | $356.00 |
| **Total Liabilities** | | $2,676.00 |
| **Total Net Worth** | | ($2,676.00) |
| **Total Monthly Cash Flow** | | $0.00 |

78.     Based upon available information, the defendant is without the ability to satisfy a fine in addition to court-imposed restitution. Restitution in this case is mandatory and must be imposed without regard to the defendant's ability to pay. If imprisoned, payments toward restitution may be collected by the Bureau of Prisons through the Inmate Financial Responsibility Program. Payments toward any remaining balance can be collected during the term of supervised release. Based upon the expectation that the defendant will be gainfully employed on a full-time basis, earning at least minimum wage, it appears the defendant should be capable of making a minimum monthly payment of $50 during any term of supervision.

## PART D. GUIDELINE COMPUTATIONS

#### Offense Level Computations

79.     The 2016 Guidelines Manual, incorporating all guideline amendments, was used to determine the defendant's offense level. USSG §1B1.11.

#### Count 1: **Violent Crime in Aid of Racketeering and Aiding and Abetting**

80.     **Base Offense Level:** The guideline for a violation of 18 U.S.C. § 1959(a)(3) is USSG §2E1.3. Pursuant to §2E1.3(a)(2), 2A2.2 is referenced when determining the offense level. The base offense level is 14. USSG §§2E1.3(a)(2) and 2A2.2(a).                                                       **14**

81.     **Specific Offense Characteristics:** If the assault involved more than minimal planning, increase by 2 levels. USSG 2A2.2(b)(1).                                                                                                 **+2**

82.  **Specific Offense Characteristics:** If a dangerous weapon (including a firearm) was otherwise used, increase by 4 levels. USSG 2A2.2(b)(2)(B).  **+4**

83.  **Specific Offense Characteristics:** If the victim sustained permanent or life-threatening bodily injury, increase by 7 levels; however, the cumulative adjustments from application of subdivisions (2) and (3) shall not exceed 10 levels. USSG 2A2.2(b)(3).  **+6**

84.  **Victim Related Adjustment:** None.  **0**

85.  **Adjustment for Role in the Offense:** None.  **0**

86.  **Adjustment for Obstruction of Justice:** None.  **0**

87.  **Adjusted Offense Level (Subtotal):**  **26**

88.  **Chapter Four Enhancement:** None.  **0**

89.  **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a).  **-2**

90.  **Acceptance of Responsibility:** The defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level. USSG §3E1.1(b).  **-1**

91.  **Total Offense Level:**  **23**

## PART E. SENTENCING OPTIONS

### Custody

92.  **Statutory Provisions:** The maximum term of imprisonment is 20 years. 18 U.S.C. § 1959(a)(3).

93.  **Guideline Provisions:** Based upon a total offense level of 23 and a criminal history category of II, the guideline imprisonment range is 51 months to 63 months.

### Impact of Plea Agreement

94.  Pursuant to USSG §1B1.3, all offense behavior has been incorporated within the count(s) of conviction. Therefore, the Plea Agreement had no impact upon the guideline calculations.

### Supervised Release

95.  **Statutory Provisions:** The Court may impose a term of supervised release of not more than three years. 18 U.S.C. § 3583(b)(2).

96.  **Guideline Provisions:** Since the offense is a Class C Felony, the guideline range for a term of supervised release is 1 year to 3 years. USSG §5D1.2(a)(2).

**Probation**

97.    **Statutory Provisions:**  The defendant is eligible for not less than one nor more than five years probation because the offense is a Class C Felony. 18 U.S.C. § 3561(c)(1). One of the following must be imposed as a condition of probation unless extraordinary circumstances exist: a fine, restitution, or community service.

98.    **Guideline Provisions:** Since the applicable guideline range is in Zone D of the Sentencing Table, the defendant is ineligible for probation. USSG §5B1.1, comment.(n.2).

**Fines**

99.    **Statutory Provisions:**  The maximum fine is $250,000. 18 U.S.C. § 3571(b).

100.   A special assessment of $100 is mandatory. 18 U.S.C. § 3013.

101.   **Guideline Provisions:** The fine range for this offense is from $10,000 to $100,000. USSG §§5E1.2(c)(3) and (h)(1).

102.   The most recent advisory from the Administrative Office of the United States Courts dated July 13, 2017, suggests that a monthly cost of $2,898.00 be used for imprisonment, $2,440.00 for community confinement, and $366.00 for supervision. USSG §5E1.2(d).

**Restitution**

103.   **Statutory Provisions:** Pursuant to 18 U.S.C. § 3663A, restitution shall be ordered in this case.

104.   **Guideline Provisions:** Restitution shall be ordered. USSG §5E1.1.

**Denial of Federal Benefits**

105.   **Statutory Provisions:** None.

106.   **Guideline Provisions:** None.

## PART F. FACTORS THAT MAY WARRANT DEPARTURE OR VARIANCE

Note: Presentation of information in this section does not necessarily constitute a recommendation by the probation officer for a departure or variance.

107.   None.

Respectfully Submitted,

/s/ Mandy L. DiFelice
Senior U.S. Probation Officer

3218053  11/15/2017 8:57 AM

**ADDENDUM TO THE PRESENTENCE REPORT**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**UNITED STATES V. BRENDA JOYCE BROWN DKT. 0417 5:16CR00012D-010**

**<u>OBJECTIONS</u>**

Neither the government nor the defendant has an objection to the Presentence Report.

Respectfully Submitted,

/s/ Mandy L. DiFelice
Senior U.S. Probation Officer

Approved:

/s/ Jay F. Neely
Supervising U.S. Probation Officer

3218053 11/15/2017 8:30 AM